# JOSEPH GOLDSTEIN

### vs.

## LILLIAN M. SACHS, BY HERMAN SACHS, HER FATHER AND NEXT FRIEND.

### *Promise to Marry—Justification for Breach.*

When no time is fixed for the wedding, the marriage is to be performed within a reasonable time according to the circumstances of each particular case; and where no place is fixed, the home of the bride is *prima facie,* by the custom of society, the place for the marriage.                                    p. 509

That a young girl, after agreeing, at the instance of her lover, when they were away from her home, to marry where they were, on further reflection determined not to do so, in the absence of her parents and without their consent, not however refusing to marry him later, did not justify her lover in breaking the engagement.                                    p. 510

*Decided May 6th, 1921.*

Appeal from the Baltimore City Court (GORTER, J.).

The cause was argued before BOYD, C. J., BRISCOE, URNER, ADKINS, and OFFUTT, JJ.

*Arthur L. Jackson,* for the appellant.

*L. Wethered Barroll,* with whom was *Hope H. Barroll* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the court.

This is an appeal from a judgment rendered by the Baltimore City Court in favor of the appellee against the appellant for the sum of $1,500 in a suit for breach of promise to marry—the case having been submitted to the court without

a jury. The plaintiff was twenty years of age on October 15, 1919, and lived with her parents in Chestertown, Md., and the defendant lived in Baltimore.

It is conclusively shown, and not denied by the defendant (appellant), that he promised to marry the plaintiff (appellee). They first became acquainted in September, 1919, although the defendant had seen her at her father's house in the latter part of August. Their acquaintance soon developed into a love affair, but according to her understanding, and apparently his also, they did not become engaged until November of that year. It was the week before Thanksgiving, on the 21st of the month, according to the evidence of the defendant and his sister-in-law. That evening he gave her a valuable ring, which seemed to be treated as the evidence of their engagement. The defendant testified that on October 21st, Mr. Sachs, the father of the plaintiff, asked him what his intentions were towards Lillian, his daughter, and in that conversation spoke of getting her clothes, a sealskin coat, etc., and was very friendly. He said that later Mr. Sachs said, "When can we arrange for the engagement, and we decided it was for Christmas." He also stated that the plaintiff had said it would be of great help to her if she had her ring, as she could come to Baltimore as often as she wanted and have more provileges. So he determined to get the ring and testified: "If I became engaged now or became engaged around Christmas it was immaterial, and if that was the girl's pleasure it was all right to me. I went to the jewelers on Friday and procured the ring," which he gave to her the night of November 21st, 1919, at his brother's house. He further testified that she "immediately called up her father and said she was engaged, and said she had gotten the ring, and he congratulated her, and asked her to call me to the 'phone, and congratulated me." He and his brother and sister-in-law went to Chestertown the following Sunday. At that time Mr. Sachs told him that he was surprised at the engagement being so soon, and that he did not know enough about him. The defendant went to see the plaintiff from time to time at the

week end and on one of these occasions Mr. Sachs said to him: "Now that you are engaged I want to know when you are going to get married," in that tone. So I said, "Mr. Sachs, as far as getting married it is hard to get a proper house, etc., and it will take a little time, but as soon as I get everything straightened out, I will let you know, with the results of it was Mr. Sachs said to me, 'Well, it only takes a couple of days to get married, if you have no home of any kind you can—Mr. Sachs says: Well, if you haven't any place you can stay with your mother or you can get a couple furnished rooms.' I says, 'Mr. Sachs, I wouldn't start out that way, it has always been my pleasure to get a home or small apartment like everybody I know, and I would like to start out and start out right, and not that way,' and her sister Sophia said, 'If you get an apartment are you going to get a spare room.' I says, 'Not as I know of.' That ended it that evening."

That was in the early part of December. He said he felt hurt at something Mr. Sachs said in Baltimore and did not go back to Chestertown any more, but that Lillian wrote to him about not coming down and said she tried to get away for Christmas, that her clothes were in poor condition and her father would not fix them for her and would not give her anything. Her father was a merchant and she spent part of the time in his store.

She went to Baltimore on December 31st, when he took her to the theatre and afterwards to a dance. He said that after they got back they talked matters over and concluded it was best go over to Washington and get married. The next morning they went to Washington and when they got there she said she would like to talk with her uncle. She saw him and told him they were going to get married. Her uncle said: "If he found he had time he would try to go to Chestertown to see her father and see if he couldn't straighten the matter out in nice sort of way, and we get married in the proper way, etc." They left her uncle and went to his son's house, that she changed her mind five or six times—saying

that she would get married and then saying that she would not. The next day, Friday, January 2nd, they returned to Baltimore. He said that on Monday, January 5th, Lillian told him that her father had called her up from Washington, saying he and his wife were coming to Baltimore and asked them to meet them at the station. They went to meet them but they had taken an earlier train and they found that they were at her aunt's. They went there, and Mr. Sachs did not speak to them and they went into the kitchen where her mother was. She welcomed them and he sat down in the kitchen. Mr. Sachs came in there and said: "Why did you want to go away and get married to Lillian. I said to him, Well, it isn't any use to go into all these things again, but the sole purpose of our agreeing to get married together was that you were not providing Lillian with the clothes you promised to give her, you always interfered in our plans, etc., and furthermore, I said, Mr. Sachs, it is pretty hard for a young man that wants to do the right thing and has always been known to do the right thing, and when a father comes to the city and asked a young man his intentions; promising to do this, not asking for all these little things, it is a pleasure to the young fellow to know he is getting a father-in-law that really is a gentleman, and there is your wife at this present moment with the sealskin coat on her back that you had promised to give your daughter. It hurt my feelings and that ended it."

Later that evening, he and Lillian agreed that the best thing for them to do was to get married. She was to go to her sister's house the next morning and she and her sister were to go uptown, he was to give them the money and let them buy whatever they wanted, and "by the time they were through, if it was in the afternoon, and if it was time to get a license, I would be willing to marry her." That was Monday night and they were to be married Tuesday, January 6th. She did not go to the house, and he did not hear from her until one o'clock that day, Tuesday. He said: "She called me up and she says, I got good news now. I was glad to hear

it. She says, Father has apologized for the way he spoke last night, and they were out buying some things, and we would be married at Chestertown. I said, Was that all arranged unknown to me, and hadn't we made other arrangements the night before? So she said, Is that the way you feel about it, and with that she hung up her receiver, and with that I hadn't heard any further from her. Later on I heard that they had left town, not calling me up, saying I am going to leave town good-bye, something of that kind; nothing was said to me, nothing whatever. So that made me feel more hurt. Then I sat down and wrote the letter which was before you, and which will describe my meaning of the letter."

He wrote the following letter:

> "Baltimore, Maryland, January 7th, 1920.
> "My dear Lillie:
>
> "Upon the decision of your mother and father and more so myself especially after having left the city unknown to me, after our conversation on the telephone yesterday, I now take for granted that in view of the treatment accorded you as well as myself after our engagement under the unfilled promise of your father, that you have chosen your choice under the unusual circumstances accorded me that I am this evening returning you the little presents which I don't *fell* to keep—and I can safely say that in the manner your father cluded me after my promise to him as a gentleman is sufficient to warrant the return of the engagement ring—regretting very much and wishing you success for the future, I beg to close forever,
> "Yours,
> "St. Paul 2215.                     Joe."

We have thus stated quite fully the testimony of the defendant, as the parties agree as to some of the material questions, although they differ in some respects. The plaintiff testified that they went to Washington twice, that the first time he did not mention marriage, but on the second trip he said: "How about our getting married while here?" She said she

was very nervous and did not know what to do—that she would say that she would marry him and in five minutes would change her mind, and say she would not. Finally she told him that if she married him in Washington she would never be forgiven by her parents and she would never be allowed to come home again, that she would be disowned and she wanted her mother present when she was married, but that she would marry him at home. She said that she and the defendant talked the matter over after they went back to her cousin's house, after 'they had been to the theatre, and he offered her a check and told her that her cousin would go out with her to buy her trousseau, but she told him that she had never taken money from anybody and did not intend to take any from him until after they were married, and said: "I will not be married until we go home."

The evidence seems to indicate that she was struggling between what she would like to do—to get married in Washington—and what she thought was her duty to her parents, and, although she was thus undecided for some time, she finally reached the conclusion stated above. There is nothing to suggest that she did not then marry him because her affection for him had in any degree lessened, but it was because she did not think it was proper for her to do so under the circumstances, and she manifested a commendable pride when she declined to accept money from him with which to purchase her trousseau, when her father was able and had promised to give it to her.

Then when she returned to Baltimore and her father and mother came there from Washington, where they had gone from Chestertown to see if she had been married (as they had heard from her sister that she was to be), she did not refuse to marry the defendant but wanted to be married at her home. She testified that when they returned from Washington this defendant told her to stay in Baltimore for about two weeks until he could get ready to marry her, that he could not leave his business for about that time. She also said she telephoned him before she left Baltimore: "I only told him

—I told him I was out with my father doing shopping, and that my father was buying my trousseau, and then he flashed up, saying he didn't want me to take anything whatsoever from my father; he was going to buy my trousseau, and he would take care of everything, and he told me not to have anything to do with my father. I told him, I am going to leave for home; I will write you just as soon as I get home; and he said, Don't you dare go home; you stay in the city and do as I say; don't do what your father says. Then I said, I must go home; mother is very ill; I must take her home; it is her wish I take her; I always want to obey my parents and I am doing it; I am going home. And I told him good-bye, I would write to him as soon as I arrived home."

That was followed by his letter of the 7th of January. She said she was made nervous and sick by that letter and was advised to take a trip to see her sister, which she did, but returned home in a few days, as she thought she might hear from the defendant. On January 27th, nearly three months before this suit was brought, she wrote to him assuring him of her love for him and that she was willing to leave her parents and become his wife, concluding her letter as follows:

"Oh, well, dear, let's forget everything that has happened and think of our wonderful future that we had planned. I am willing to forget and forgive, so that we might be happily married. Let's start up our correspondence again and be real sweet and loving to each other like we always were. Hoping to hear from you by return mail. Remember me to all the folks.

"As ever yours,

"Lillian."

When the engagement ring was given, on November 21st, 1919, it was not pretended that any time was fixed for the wedding. The law is that when no time is fixed, the marriage is to be performed within a reasonable time according to the circumstances of each particular case. 4 *R. C. L.* 147; 9 *C. J.* 330; 4 *Am. & Eng. Enc. of Law*, 890. Where no place is

fixed, the home of the bride is *prima facie*, by the custom of society, the place for the marriage. 4 *Am. & Eng. Enc. of Law*, 892; 4 *R. C. L.* 148; 9 *C. J.* 331.

If a young girl at the instance of her lover agrees when they are away from her home to marry where they are, and then on further reflection determines not to do so, in the absence of her parents and without their consent, but does not refuse to marry him later, it certainly cannot be said that her refusal to then get married could justify her lover in breaking the engagement. Even when the date has been fixed, it is stated in 4 *R. C. L.* 149 that "a postponement of the performance of a contract of marriage from the date fixed therefor, by one party without the consent of the other, does not constitute an actionable breach of the contract, if based upon good and sufficient reason." Or, as stated in 9 *C. J.* 333: "A mere postponement of the marriage or failure to marry on the day set therefor does not necessarily constitute a breach, as the contract is deemed to continue in force until one or the other of the parties, either by words or conduct, shows that he or she is unwilling to fulfill the contract, and if the party postponing the marriage has a good and sufficient reason therefor, the postponement does not amount to a breach, even though the other party does not consent thereto."

So if we assume that the defendant's version is the correct one, as to what took place in Baltimore after their return from Washington, we cannot hold that there was any breach on the part of the plaintiff which justified the defendant in writing the letter of January 7th, and in taking such action as he did in demanding the return of the ring, suing her for it, etc. The plaintiff's father was, as far as appears in the record, fully able to provide her with a trousseau, or such clothes as were necessary, and if, after being persuaded by the defendant, she agreed to let him provide clothes for her and then on further reflection concluded not to do so, she only did what any girl, who had proper respect for herself and her father would likely do, after giving the matter consideration and when she was not under the immediate influence of

her lover to have a hasty marriage, regardless of the feelings of her mother. The plaintiff testified that her mother had been made sick by hearing that they were married in Washington.

The defendant is not without fault, if a change of mind is evidence of it, as he seems to have changed several times. When her father said he would get his daughter nice clothes and a sealskin coat, the defendant seemed to be well satisfied, but later told the plaintiff that he did not want her to accept anything from her father, although he says he was hurt when he saw her mother have on the sealskin coat which the daughter was to have. At first he was greatly pleased at the reception given him by the family, including her father, but later changed his mind. It is said in the appellant's brief: "It is perfectly apparent from the entire record that her father particularly was doing his best to prevent the marriage, and also it is clear that he had succeeded and had taken the plaintiff back to Chestertown with him for that very purpose." If he was the parsimonious man he was represented to be by the defendant, it is not made clear why he would have opposed the marriage if the defendant was going to save him from the expense of a trousseau and was able to provide for his daughter. But a father and mother cannot be censured for urging their daughter to be married in the way which evidently was originally intended and expected, and, as they were all of the Jewish faith, probably in their accustomed way, instead of hastily marrying away from home in Washington or Baltimore—especially as the defendant had told her father in December that he was not then in condition to marry.

Under the evidence there can be no doubt that the first and second prayers were properly rejected. It is said in 9 *C. J.* 350, that "where plaintiff has established a promise and a breach with loss, a *prima facie* case is made out, thus throwing on defendant the burden of vindicating himself," and when we recall that no time or place had been fixed for the marriage when they became engaged, and consider the author-

ities cited above, the burden might well be placed on him, but regardless of that, we can have no doubt that the third and fifth prayers of the defendant were under the circumstances of the case, properly rejected. Both of them ignored the reasons given by the plaintiff for changing her mind. Just why the defendant's fourth and sixth prayers were granted in the shape they are does not appear, but the appellant cannot complain of that action.

We do not understand the motion to dismiss the appeal to be pressed, and hence we will not discuss it, but will overrule it. It follows from what we have said that the judgment must be affirmed.

> *Motion to dismiss the appeal overruled, and judgment affirmed, the costs to be paid by the appellant.*